AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

**LODGED**
CLERK, U.S. DISTRICT COURT

4/6/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____KM_____ DEPTUY

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

April 6, 2026

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____1V_____ DEPUTY

United States of America,

v.

Vlad-Constantin Stoicov,

Defendant

Case No.   2:26-mj-02015-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 3, 2026, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of Unauthorized Access Devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Nicole Heffernan, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      04/06/2026

*Patricia Donahue*
*Judge's signature*

City and state:   Los Angeles, California

The Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Iricel E. Payano (x3899)

**AFFIDAVIT**

I, Nicole Heffernan, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

This affidavit is made in support of a criminal complaint against Vlad-Constantin STOICOV ("STOICOV"), also known as ("aka") "Vasile Marius MANOILESCU," aka "Vlad-Constantin STOICOV," aka "Stoicov CONSTANTIN," for a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices).

This affidavit is also made in support of an application for a warrant to search of the following: one black and dark grey Samsung cellular telephone seized from STOICOV on April 3, 2026 (the "SUBJECT DEVICE") and currently in the custody of the West Covina Police Department ("WCPD"), in West Covina, CA, as described in Attachment A.

The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and

search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since February 2008.  I am empowered to conduct investigations and to make arrests for federal offenses enumerated in Section 2516 of Title 18 of the United States Code.

6.    I have been employed with HSI since February 2008.  As part of my training with HSI, I attended a twenty-six (26) week training academy at the Federal Law Enforcement Training Center in Glynco, Georgia, which included blocks of instruction on conducting narcotics trafficking and money laundering investigations.  Prior to that, I was employed by the Garden Grove Police Department as a Community Services Officer from 2007 to 2008.  From 2005 to 2007, I was employed by the Orange County Sheriff's Department as a Crime Prevention Specialist. From 2000 to 2004, I was employed by Costa Mesa Police Department as a Community Services Officer.  I possess a bachelor's degree in sociology from California State University at Fullerton and a master's degree in criminal justice from Chapman University.

7.    I am currently assigned to HSI Los Angeles, California, El Camino Real Financial Crimes Taskforce, which is

2

an enforcement group that investigates federal criminal laws relating to financial institution fraud, credit card fraud, bank fraud, cybercrimes, and identity theft, among other federal criminal offenses. During my time with HSI, I have led and participated in criminal investigations dealing with a myriad of criminal offenses, to include those mentioned above.

8.    I am familiar with the facts and circumstances of this investigation based on my participation in this investigation, discussions with other officers and agents and foreign law enforcement partner agencies involved in this investigation, my training and experience as an HSI Special Agent, and my familiarity with reports by other law enforcement personnel.

9.    Because this affidavit is being submitted for the limited purpose of securing the requested order, I have not included every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause for the requested complaint and search warrant. Where statements of others are set forth in this affidavit, they are set forth in substance and in part.

10.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

Between January 2025 and January 2026, the California Department of Social Services ("CDSS") detected more than $60.9 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards. This fraud is from two programs known as CalFresh and CalWORKs, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent

3

withdrawals are done at specific ATMs in the Central District of California.

On or about April 3, 2026, law enforcement in the Central District of California conducted surveillance at Chase Bank, located at 2800 E. Workman Avenue, West Covina, CA 91791 ("Target Bank"), which was identified by CDSS as one of the top ATM locations for EBT fraud.

At approximately 7:15 a.m., WCPD Detectives observed STOICOV at an ATM terminal located at Target Bank.  Law enforcement established surveillance and observed STOICOV make numerous transactions at the ATM using several different access devices in rapid succession.  STOICOV withdrew approximately $4,870 in cash from the ATM using seven unauthorized access devices. STOICOV was then detained and found with approximately 80 access devices in his possession, later determined to be cloned California EBT cards, seven of which had the same EBT card information STOICOV used to withdraw the $4,870 in cash. STOICOV was then arrested and also found in possession of approximately $4,800 in cash and the SUBJECT DEVICE.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

Based on my review of law enforcement reports, conversations with other law enforcement officers, and my own knowledge of the investigation, I am aware of the following:

A.    **Regulatory Background of CalFresh and CalWORKs Programs**

CDSS is a government agency that administers several benefit and assistance programs for residents of the state of

4

California.  One of the assistance programs administered by CDSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs.  Another assistance program administered by CDSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

15. Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

16. CalFresh and CalWORKs benefits are issued through EBT cards.  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions.  For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

17. The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like CDSS, which administers the CalFresh and CalWORKs programs.

18. Benefits received through the program are typically disbursed to EBT cardholders by CDSS during the early days of

5

each month.  Those benefits are deposited directly from CDSS into the account of the EBT cardholder.

The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder.

19. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by CDSS intended for beneficiaries of the CalFresh or CalWORKs programs.

B.    **Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

Since in or about August 2022, local law enforcement

20. has been working with CDSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to CDSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

21. A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the CDSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

6

22. On a legitimate debit or credit card, the information contained on the card's magnetic stripe will match the information embossed on the front of the card. This information includes the account number, expiration date, and cardholder's name, among other information. Whereas on a cloned card, the information contained on the magnetic stripe will not match the information embossed on the front of the card. For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

23. Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

24. The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals. For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number. Those individuals will then return to the ATM to

collect the card number and PIN information stored on the installed device.

As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming.  Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area.  This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period of time.  Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

As a result of this operation, local law enforcement established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud. Law enforcement surveilled those ATMs around the dates when benefits had been disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to

8

be making fraudulent withdrawals of EBT benefits. As a result, law enforcement arrested approximately 16 suspects. All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States. All of the individuals arrested were released from local custody within hours of their arrest and absconded from any future judicial proceedings.

28. In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs. Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession. Two of those defendants came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022. One additional defendant possessed 269 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that the defendant had made more than $70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023. All three of these defendants

9

were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States. The three arrested defendants were ordered detained pending trial by the Hon. Karen Stevenson and Hon. Margo A. Rocconi. A federal grand jury returned two indictments against the three defendants for bank fraud, in violation of 18 U.S.C. § 1344; aggravated identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. § 1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

29.    From March 2025 through September 2025, federal law enforcement conducted multiple surveillance and arrest operations in the Los Angeles, California area. Law enforcement arrested approximately thirty-nine suspects that conducted unauthorized EBT transactions. At the time of their arrest, the suspects had in their possession cloned EBT cards, cash in illicitly obtained funds, and multiple skimming devices. 34 out of the 39 defendants were determined to be citizens of other countries, of which twenty-eight were Romanian citizens, the majority did not have documentation to be lawfully present in the United States.

30.    **C.    Background of Current Operation to Combat EBT Fraud**

The most current data provided by CDSS, based in part upon reported fraud by victims, indicates that between January 2025 and January 2026, more than approximately $60.9 million in

10

cash benefits has been stolen from victim EBT cards throughout California.

Of the more than approximately $60.9 million in cash benefits stolen during this year time period, more than approximately $30.6 million has been stolen from victim EBT cards, in the county of Los Angeles alone. The majority of these funds were stolen through unauthorized ATM withdrawals.

31. In the month of January 2026, according to data from CDSS, more than approximately $3.7 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals. Of the approximately $3.7 million stolen from victim EBT cards in the month of January 2026, more than approximately $2.1 million was stolen, mostly through unauthorized ATM withdrawals, in Los Angeles County alone.

32. Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices.  Thus, suspects using skimming may target the BIN associated with CDSS, in essence, targeting CalFresh and CalWORKs benefits.  Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

33.

11

34.    Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM.  Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

35.    Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals are happening during the early days of the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

### D.    STOICOV Committed EBT Fraud By Using Unauthorized Access Devices on April 3, 2026

36.    Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement in the Central District of California conducted a surveillance and arrest operation in April 2026, working jointly with WCPD and the Orange County District Attorney's Office.

12

37. During the operation, OCDA investigators began receiving computerized fraud alerts from a list of compromised EBT cards. Fraud monitoring systems ("FIS") track potentially compromised EBT accounts. When an EBT card is identified as compromised through patterns such as unauthorized balance inquiries from suspects on the victims EBT account, the account information is placed on a "compromised card list." When that compromised card is subsequently used, including at ATMs within Los Angeles County, automated alerts are generated and sent via email to law enforcement and investigators, allowing for real-time monitoring and response.

38. Furthermore, based upon my training and experience, I know that as an anti-fraud measure, CDSS places an embargo on EBT accounts, such that EBT cardholders are not able to conduct cash withdrawals from their EBT cards from approximately 12:00 a.m. to 6:00 a.m., on the morning that their funds load (i.e., the 1st, 2nd, or 3rd of the month, depending on the account).

39. Based on my review of reports from law enforcement who conducted in-person surveillance the morning of April 3, 2025, I know that beginning at approximately 7:00 a.m., law enforcement began receiving FIS computerized alerts regarding several compromised card being utilized at the TARGET BANK.

40. At approximately 7:14 a.m., based on my conversations with WCPD Detective Jeremy Wagner, I know that STOICOV was observed by law enforcement using the ATM Terminal at Target Bank. STOICOV was the only person present at the ATM Terminal. There, and over a period of several minutes, law enforcement saw

13

STOICOV conduct multiple apparent ATM transactions, all while law enforcement was still receiving new FIS alerts for that location, confirming that the transactions law enforcement was observing STOICOV conduct were in fact EBT fraudulent transactions.  The transactions were occurring in rapid succession, indicative that STOICOV was conducting both card balance inquires and cash withdrawals.  Based upon my training and experience, I know that subjects involved in EBT fraud often check EBT account balances before conducting a cash withdrawal to verify the available cash balance in the account. Furthermore, based on my training and experience, I know individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time.

41.     Based on the date, time, ATM location, presence of multiple, and successive ATM transactions during a short time period, law enforcement detained STOICOV, as he was walking away from the ATM location, in order to investigate further.

42.     STOICOV was subsequently arrested. During a search of STOICOV's person incident to arrest, law enforcement found approximately $4,871 in U.S. currency and 80 cloned cards in his possession, which consisted of magnetic-striped stored value gift cards such as Vanilla Visa and PayPal Master Card. The access devices had stickers placed on them with handwritten numbers of what appeared to be, based on my training and experience, victim PINs, card balances, or both. The following

14

photographs are a sampling of the cloned cards seized from

MANIOLESCU, subsequent to his arrest:

15





43.

Law enforcement analyzed the magnetic stripes of the 80 access devices mentioned above and determined that all the access devices were encoded with California EBT BINs. Moreover, each of the cloned cards was confirmed to be affixed with a sticker bearing victim PINs, account balances, or both, that

17

closely corresponded to each cloned card and withdrawal amount. These numbers were required in order to conduct the unauthorized ATM withdrawal.

44. Based on a review of preliminary transaction data for the Target Bank ATM, during the time when STOICOV was at the ATM, there were at least seven withdrawals involving seven different EBT card numbers – which matched seven EBT card numbers encoded on seven cloned cards seized from STOICOV incident to his arrest. Those seven transactions totaled $4,870 in financial loss and STOICOV was arrested with $4,871 in his possession.

45. STOICOV advised law enforcement that his name is Vlad-Constantin STOICOV. Law enforcement also learned via law enforcement database inquires, and through STOICOV's own statements to WCPD Detective Wagner that in 2022, STOICOV escaped a German prison after being convicted of aggravated robbery and sentenced to six years in prison.  STOICOV advised that he did not believe he was wanted by German law enforcement for the prison escape and had, in essence, just fled to Romania. Law enforcement was unable to positively confirm if STOICOV was wanted by German law enforcement for the 2022 prison escape. HSI was unable to locate any wants or warrants in INTERPOL for STOICOV related to the German prison escape.

46. HSI queried STOICOV in U.S. Immigration and Customs Enforcement databases in an effort to verify STOICOV's immigrations status, but were unable to locate any records, leading your affiant to believe that STOICOV entered the United

18

States without inspection and currently has no lawful status to be present or remain in the United States.

The SUBJECT DEVICE was retrieved from STOICOV's left jacket pocket and placed into "airplane mode" to secure the device pending issuance of a search warrant.

After being advised of his Miranda rights by WCPD Detective Wagner, and agreeing to waive said rights and speak with law enforcement, STOICOV advised that he was working under the direction of an unnamed co-conspirator to conduct these EBT fraudulent cash withdrawal and would receive a 15% commission fee as payment from the money fraudulently withdrawn from the EBT cards. Furthermore, STOICOV told law enforcement he traveled by Uber from a destination in Los Angeles, CA, to the ATM to conduct the fraudulent EBT card transactions. STOICOV confirmed that this was his first time participating in this type of fraud in the United States and acknowledged the activity was illegal. STOICOV advised he has been in the United States for only 10 days and had previously lived in Canada.[1]

### V.   TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES

Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.   It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital

---

[1] HSI was unable to locate any travel or immigration records for STOICOV.

19

devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.   Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.   It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

20

d.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers.

e.    Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos. Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

f.    Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

21

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[2]

Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.     Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.     Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[2] As used herein, the term "digital device" includes the SUBJECT DEVICE as well as any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

52.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

53.

## VII.  <u>CONCLUSION</u>

For all of the reasons described above, there is probable cause to believe that STOICOV has committed a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices).  There is also probable cause that the items to be seized

24

described in Attachment B will be found in a search of the

SUBJECT DEVICE as described in Attachment A.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 6th day of April, 2026.

THE HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

25